# United States Court of Appeals
# for the Federal Circuit

_____

**MERIAL LIMITED** AND **MERIAL SAS,**
*Plaintiffs-Appellees,*

**and**

**BASF AGRO B.V.,**
*Plaintiff,*

v.

**CIPLA LIMITED,**
*Defendant-Appellant,*

**and**

**VELCERA, INC.** AND **FIDOPHARM, INC.,**
*Defendants-Appellants,*

**and**

**ARCHIPELAGO SUPPLIERS, ARROWTARGET
ENTERPRISES LTD.,
GENERIC PETMEDS, INHOUSE DRUGSTORE,
LISA PERKO,
PETCARE PHARMACY,** AND **PETMEDS R US,**
*Defendants.*

_____

2011-1471, -1472

_____

Appeals from the United States District Court for the Middle District of Georgia in Case No. 07-CV-0125, Judge Clay D. Land.

———————————

Decided: May 31, 2012

———————————

GREGORY A. CASTANIAS, Jones Day, of Washington, DC, argued for the plaintiffs-appellees. With him on the brief were DAMON M. LEWIS; and J. PATRICK ELSEVIER, of San Diego, California. Of counsel on the brief were JUDY JARECKI-BLACK, Merial Limited, of Duluth, Georgia, FRANK G. SMITH, III, Alston & Bird, LLP, of Atlanta, Georgia, and EDWARD DONALD TOLLEY, Cook, Noell, Tolley, Bates & Michael, LLP, of Athens, Georgia.

NAGENDRA SETTY, Sheppard, Mullin, Richter & Hampton LLP, of San Francisco, California, argued for defendant-appellant Cipla Limited. Of counsel were PAUL WENDELL GARRITY and MARK EDWARD MCGRATH, of New York, New York.

JONATHAN G. GRAVES, Cooley LLP, of Reston, Virginia, argued for defendants-appellants FidoPharm, Inc., et al. With him on the brief were PHILLIP E. MORTON; and TRYN T. STIMART, of Washington, DC. Of counsel was LORI R. MASON, of Palo Alto, California. Of counsel on the brief were GEORGE C. LOMBARDI, Winston & Strawn LLP, of Chicago, Illinois; and ELIZABETH P. PAPEZ, of Washington, DC.

———————————

Before LOURIE, SCHALL, and REYNA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* LOURIE.
Dissenting opinion filed by *Circuit Judge* SCHALL.

LOURIE, *Circuit Judge.*

Cipla Ltd. ("Cipla") joins with Velcera, Inc. and Fido-Pharm, Inc. (collectively, "Velcera") in appealing from a judgment entered by the United States District Court for the Middle District of Georgia in favor of Merial Ltd. and Merial SAS (collectively, "Merial") holding Cipla in contempt for violating an earlier injunction and holding Velcera in contempt for acting in concert with Cipla to violate that injunction. *Merial Ltd. v. Cipla Ltd.*, No. 3:07-CV-125 (CDL), 2011 U.S. Dist. LEXIS 65639, 2011 WL 2489753 (M.D. Ga. June 21, 2011) ("*Contempt Order*"). For reasons set forth below, we *affirm* the district court's judgment.

BACKGROUND

*The Patented Pest Control Technology*

This appeal concerns patented compositions for protecting domestic dogs and cats from infestation with ectoparasites, *e.g.*, fleas and ticks. In particular, the dispute centers on topically applied or "spot on" veterinary compositions containing pesticidal N-phenylpyrazole derivatives, such as fipronil, applied directly to the skin of an animal. BASF's U.S. Patent 5,232,940 ("the '940 patent"), now expired, claimed fipronil and fipronil-based compositions as well as methods of using such compositions for pest control. Merial, as the exclusive licensee of the '940 patent, developed commercially successful spot-on fipronil compositions sold under the brand name Frontline.

In addition to producing fipronil-only products, Merial devised dual-acting pest control compositions covered by U.S. Patent 6,096,329 ("the '329 patent"). In particular,

the '329 patent claims spot-on compositions containing fipronil combined with a second active ingredient—specifically, an insect growth regulator ("IGR"). In contrast to pesticides, which work through direct toxicity, IGRs act not by killing individual parasites but rather by interrupting the life cycle within a parasite population. The '329 patent discloses numerous IGRs—such as methoprene, for example—that mimic natural insect hormones to prevent immature or juvenile-stage parasites from reaching reproductive maturity, thereby limiting and eventually depleting an infestation. In the pesticide-plus-IGR compositions disclosed in the '329 patent, the paired active ingredients complement one another through their distinct methods of action to achieve improved pest protection relative to either agent administered alone. Merial markets compositions combining fipronil and methoprene as Frontline Plus, the leading veterinary flea and tick treatment in the United States.

### *The 2008 Default Judgment*

Cipla is a pharmaceutical company incorporated under the laws of India with its principal place of business in Mumbai, India. In November 2007, Merial filed suit against Cipla and various internet retailers in the United States District Court for the Middle District of Georgia alleging infringement of the '940 and '329 patents ("the 2007 complaint"). Merial alleged that Cipla was subject to personal jurisdiction in the district court by virtue of Cipla's alleged contacts with and conduct within the state of Georgia, and Merial provided Cipla with service of process in Mumbai by courier and registered mail. According to the 2007 complaint, Cipla and the defendant online retailers sold throughout the United States spot-on veterinary pesticide products known as "Cipla Protektor" and "Cipla Protektor Plus" that constituted infringing

formulations of fipronil or fipronil and methoprene, respectively.

Neither Cipla nor any of the other defendants responded to the 2007 complaint or entered an appearance in the district court. Merial therefore moved to hold the defendants in default pursuant to Federal Rule of Civil Procedure 55, and the district court granted that motion on March 6, 2008. In relevant part, the district court found that the '940 and '329 patents were not invalid, found that Cipla had infringed each patent, and entered a permanent injunction barring Cipla from directly or indirectly infringing the '940 or '329 patents in the future:

> [Cipla], as well as those persons and entities in active concert with [Cipla] who have notice of this order, are herewith permanently enjoined from committing any act that infringes or causes or induces infringement of any claim of the '940 or '329 patents, including but not limited to making, having made, using, causing to be used, selling, causing to be sold, offering for sale, and causing to be offered for sale in the United States, and importing and causing to be imported into the United States, any product that infringes any claim of the '940 or '329 patents, including but not limited to the veterinary products denominated CIPLA PROTEKTOR that contain fipronil and the products denominated CIPLA PROTEKTOR PLUS that contain fipronil and methoprene.

*BASF Agro B.V. v. Cipla Ltd.*, No. 3:07-CV-125 (CDL) (M.D. Ga. Mar. 6, 2008), ECF No. 18, slip op. at 2–3 ("*Default Order*"). On April 14, 2008, Cipla filed in the court an "informal" communication that referenced the default proceedings but was "not intended to constitute an appearance," in which Cipla denied infringing or having

"any presence in the United States and in this judicial district" and requested dismissal of the action. J.A. 1130–31. The district court denied Cipla's request for such "informal equitable assistance" and entered final judgment on April 15, 2008. *BASF Agro B.V. v. Cipla Ltd.*, No. 3:07-CV-125 (CDL) (M.D. Ga. Apr. 15, 2008), ECF Nos. 22, 23.

*The PetArmor Plus Venture*

Velcera was formed in 2004 to develop veterinary pharmaceuticals for companion animals such as dogs and cats, beginning with products for inhalation-based drug delivery. Led by former Merial executives, Velcera later began preparations to enter the market for flea and tick control products. In particular, Velcera intended to introduce products that would "directly compete" with Merial's Frontline series "at a substantially lower price." J.A. 2222. Through its relationship with a two-person British company known as Omnipharm Ltd. ("Omnipharm"), Velcera engaged with Cipla to develop, test, manufacture, and distribute such products, and by April 2011 those efforts culminated in U.S. sales of spot-on pest control compositions containing fipronil and methoprene—sold as PetArmor Plus and Velcera Fipronil Plus (collectively, "PetArmor Plus")—that prompted the contempt proceedings at issue in this appeal. *See* J.A. 2222–27. We now briefly recount the roles played by each of the principal entities, and their many subsidiaries, in the development and production of PetArmor Plus.

In February 2008, Velcera established FidoPharm as its wholly owned subsidiary, and, on the same day, FidoPharm executed a license and development agreement with Omnipharm under which Omnipharm would develop the PetArmor Plus formulations and license those formulations exclusively to FidoPharm for sale in the United

States.  J.A. 2225–26.  In addition, the license and development agreement between FidoPharm and Omnipharm identified Cipla as the intended manufacturer of PetArmor Plus.  *Id.*  FidoPharm simultaneously entered into a separate manufacture and supply agreement with QEDetal Ltd. ("QEDetal")—an Irish entity held entirely by the director of Omnipharm and established through a collaboration between Omnipharm and Cipla.  J.A. 2225; 4859–60.  Under that agreement, QEDetal would supply FidoPharm with finished PetArmor Plus products for importation and sale within the United States.  FidoPharm was to submit orders and payments to QEDetal, QEDetal would then direct Cipla to produce and deliver sufficient product to fulfill FidoPharm's order, and finally QEDetal would transfer the finished PetArmor Plus to FidoPharm.  J.A. 2225–26.

Like Velcera, Cipla entered into its own set of parallel development and supply agreements with Omnipharm and QEDetal, respectively, in April 2008.  Under its development agreement with Omnipharm, Cipla agreed to conduct laboratory testing and otherwise assist in the development and regulatory approval of the PetArmor Plus formulations.  J.A. 2226.  In addition, Cipla's manufacture and supply agreement with QEDetal specified that Cipla would satisfy QEDetal's requirements for fulfilling PetArmor Plus orders placed by FidoPharm pursuant to the FidoPharm/QEDetal manufacture and supply agreement.  *Id.*

In practice, the parties' interrelated web of agreements and intermediaries involved in producing and distributing PetArmor Plus functioned as follows: Velcera (through FidoPharm) would place an order for PetArmor Plus with Omnipharm, which would then pass the order to Cipla.  Upon producing the product in India, Cipla would transfer ownership of the new PetArmor Plus to

QEDetal LZE,[1] which would in turn ship the product from India to Dubai and there transfer title to QEDetal. Formal ownership of the product would transfer yet again in Dubai, from QEDetal to FidoPharm, and, finally, Fido-Pharm would import the PetArmor Plus for sale in the United States. Monetary consideration for each order would flow from FidoPharm to Cipla along a reciprocal path that mirrored the product supply chain.

With their contractual agreements in place, Velcera, Cipla, and Omnipharm worked to develop PetArmor Plus and secure regulatory approval in the United States. Through FidoPharm, Velcera worked with Omnipharm to design the PetArmor Plus formulation and directed Cipla to manufacture and test candidate formulations in India. In addition, Velcera established LoradoChem, Inc. ("Lora-doChem") as a wholly-owned subsidiary of Velcera's wholly-owned FidoPharm subsidiary to file the regulatory applications necessary for approval to import and sell PetArmor Plus in the United States. LoradoChem prepared and submitted to the United States Environmental Protection Agency ("EPA") an "Identical/Substantially Similar Product" pesticide registration application, which facilitates expedited registration for products that are substantially similar or identical to a previously registered pesticide formulation. *See* 7 U.S.C. § 136a(c)(3)(B). In communications with the EPA, LoradoChem identified PetArmor Plus as "identical or substantially similar" to Merial's previously registered Frontline Plus products and submitted experimental data generated by Cipla to support that assertion. Indeed, those data showed that PetArmor Plus contains the same concentrations of fipronil and methoprene as Frontline Plus. As required

---

[1] QEDetal LZE is a corporate entity established in the United Arab Emirates and owned, like QEDetal, by the director of Omnipharm. J.A. 2227.

by the EPA, LoradoChem also submitted Cipla's EPA establishment number 87688-IND-01 with its application, identifying Cipla as the sole manufacturer of PetArmor Plus. In view of LoradoChem's submissions, the EPA approved PetArmor Plus for pesticide registration as identical/substantially similar to Frontline Plus on January 10, 2011.

Soon thereafter, PetArmor Plus production began. Upon request, Cipla manufactured each unit of PetArmor Plus for delivery to QEDetal, transfer to QEDetal LZE and FidoPharm, and eventual importation into the United States. Cipla supplied PetArmor Plus in finished, market-ready condition, with the pesticide formulation provided in single-dose pipettes and enclosed in its final retail packaging. Cipla's PetArmor Plus packaging included Cipla's EPA establishment number, as required for all pesticide products sold in the United States, as well as U.S. telephone numbers promising 24-hour customer support. An exemplary unit of PetArmor Plus, finished and ready for sale, is depicted below:



Br. Appellee at 43. The first shipments of PetArmor Plus arrived in the United States in March 2011 and were offered for sale the following month.

*The 2011 Contempt Proceedings*

Having become aware of Cipla's role in the impending commercial launch of PetArmor Plus, Merial filed a motion for contempt in the United States District Court for the Middle District of Georgia on March 28, 2011 (the "contempt proceedings"). J.A. 1135–54. Merial contended that Cipla's activities relating to PetArmor Plus violated that court's 2008 injunction against infringement of the '329 patent.[2] In particular, Merial alleged that PetArmor Plus was no more than a rebranded version of Cipla's enjoined Protektor Plus product and that the importation and sale of PetArmor Plus within the United States therefore violated the injunction. Velcera moved to intervene in the contempt proceedings as an interested party on April 8, 2011, and was promptly joined as a defendant and ordered to show cause why it should not be held in contempt for acting in concert with Cipla to contravene the 2008 injunction.

Meanwhile, Velcera had filed a declaratory judgment complaint against Merial in the United States District Court for the District of Delaware on February 11, 2011, alleging noninfringement and invalidity of the '329 patent (the "Delaware action").[3] Merial answered on March 7, 2011, denying Velcera's allegations and asserting coun-

---

[2] The '940 patent, covering fipronil-only pest control compositions, had expired by the time Merial initiated the contempt proceedings in March 2011.

[3] Velcera's declaratory judgment complaint also included claims of noninfringement and invalidity directed at Merial's U.S. Patents 6,620,943 and 6,881,848. Those patents are not at issue in this appeal.

terclaims that included infringement of the '329 patent. Cipla was not a party to the Delaware action.

In the contempt proceedings, Cipla sought to vacate the 2008 injunction as void, alleging that the district court had lacked personal jurisdiction over Cipla when it issued the *Default Order* in 2008. Cipla and Velcera argued that even if the injunction rested on sound jurisdictional footing, their production and sale of PetArmor Plus did not violate the court's earlier order. Velcera further maintained that, as a non-party to the underlying default judgment, it was not subject to the injunction and, regardless, that it had not acted in concert with Cipla to violate the injunction. Finally, Velcera contended that the contempt proceedings should be stayed pending a decision on the '329 patent's validity in the co-pending Delaware action.

The district court declined to stay the contempt proceedings and issued its decision on June 21, 2011. The court concluded that Cipla had been subject to its jurisdiction when it issued the 2008 injunction pursuant to Federal Rule of Civil Procedure 4(k)(2) instead of the Georgia long-arm statute, that PetArmor Plus was not more than colorably different from Cipla's previously enjoined Protektor Plus product, and that Cipla and Velcera had knowingly acted in concert to violate the court's order. *Contempt Order*, 2011 WL 2489753, at *8–14. In light of the defendants' "contumacious" conduct, the court issued a permanent injunction precluding Cipla from making, using, selling, or importing into the United States veterinary products containing fipronil and methoprene and prohibiting Velcera from doing the same with any such products developed, manufactured, or packaged

with the assistance or participation of Cipla.[4] *Id.* at \*16–17.

Cipla and Velcera timely appealed from the district court's judgment of contempt; we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review a district court's exercise of personal jurisdiction over an accused infringer without deference, applying Federal Circuit law rather than the law of the regional circuit. *Nuance Commc'ns v. Abbyy Software House*, 626 F.3d 1222, 1230 (Fed. Cir. 2010). Findings of fact that bear on personal jurisdiction are reviewed for clear error. *Id.* When reviewing a district court's determination as to contempt of an injunction against infringement, we apply an abuse of discretion standard, *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1370 (Fed. Cir. 2010) (per curiam), and the factual findings underlying a contempt decision are reviewed for clear error, *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 883 (Fed. Cir. 2011) (en banc). Whether a non-party to an injunction proceeded "in active concert" with another party bound by that injunction, as set forth in Fed. R. Civ. P. 65(d)(2)(C), presents an issue of fact that we review for clear error. *Additive Controls & Measurement Sys., Inc. v. Flowdata,*

---

[4]    Soon after the district court entered the *Contempt Order*, Velcera's declaratory judgment claims relating to the '329 patent in the Delaware action were dismissed for lack of subject matter jurisdiction: "Given the current injunction [in the Georgia contempt proceedings] and the fact that Velcera does not have a new, non-enjoined product containing fipronil and methoprene, there is no actual controversy between the parties." *Velcera Inc. v. Merial Ltd.*, No. 11-CV-134 (GMS) (D.Del. Aug. 3, 2011), ECF No. 38, slip. op. at 4 n.4.

*Inc.*, 154 F.3d 1345, 1351 (Fed. Cir. 1998) ("*Additive Controls II*").

Between them, Cipla and Velcera (collectively, "Appellants") present a panoply of arguments disputing various aspects of the *Contempt Order*. We will address each in turn.

I

Appellants first challenge the contempt judgment as founded on an invalid injunction, alleging that the district court lacked personal jurisdiction over Cipla when it issued the default judgment in 2008. Appellants therefore argue that the district court erred in denying Cipla's motion to vacate the 2008 default judgment and injunction pursuant to Fed. R. Civ. P. 60(b)(4). In particular, Appellants contend that Rule 4(k)(2) could not have conferred jurisdiction over Cipla in the Middle District of Georgia due to Cipla's present assertion of consent to jurisdiction in the Northern District of Illinois and Merial's failure to observe effective procedures for service of process in India. Furthermore, Cipla asserts that the district court's reliance on Rule 4(k)(2) was impermissible because Merial did not plead Rule 4(k)(2) as a basis for personal jurisdiction in the 2007 complaint.

Merial responds that Rule 4(k)(2) was applicable when it filed suit in 2007, that Cipla had denied contacts with Illinois or any other U.S. jurisdiction at that time, and that Cipla's belated consent to jurisdiction in Illinois does not defeat Rule 4(k)(2) because there is no independent basis for jurisdiction in that forum. Merial argues further that Cipla's complaints regarding service of process are untimely and therefore waived on appeal. Finally, Merial argues that it is irrelevant whether or not its original complaint explicitly mentioned Rule 4(k)(2) because there is no requirement to plead a specific basis

for personal jurisdiction and because courts may rely on that rule even when it has not been cited by the parties.

For the reasons set forth below, we hold that Rule 4(k)(2) supports the district court's exercise of personal jurisdiction over Cipla in entering the 2008 default judgment and injunction and that the district court therefore correctly denied Cipla's motion to vacate that judgment on jurisdictional grounds.

A

"Rule 4 is the starting point for any personal jurisdiction analysis in federal court." *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*, 563 F.3d 1285, 1293 (Fed. Cir. 2009) (citing Fed. R. Civ. P. 4 and *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)). Personal jurisdiction over foreign defendants in federal court typically depends on the existence of sufficient contacts between the defendant and the forum state, requiring the plaintiff to establish that the exercise of personal jurisdiction over the defendant would satisfy the forum state's long-arm statute and comport with constitutional principles of due process such that the defendant would be subject to personal jurisdiction in the courts of the forum state. *See generally* 4A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1069 (3d ed.).

Rule 4(k)(2) was adopted to provide a forum for federal claims in situations where a foreign defendant lacks substantial contacts with any single state but has sufficient contacts with the United States as a whole to satisfy due process standards and justify the application of federal law. *Synthes*, 563 F.3d at 1295–96 (citing advisory committee notes to the 1993 amendment establishing Rule 4(k)(2)). Rule 4(k)(2) thus approximates a federal long-arm statute, allowing district courts to exercise personal jurisdiction even if the defendant's contacts with

the forum state would not support jurisdiction under that state's long-arm statute, as long as (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to personal jurisdiction in the courts of any state, and (3) the exercise of jurisdiction satisfies due process requirements. *Id.* at 1293–94.

## B

As noted, one precondition for applying Rule 4(k)(2) is that the defendant must not be subject to personal jurisdiction in the courts of any state (sometimes called the "negation requirement"). *Id.* at 1293. Although the burden of establishing personal jurisdiction ordinarily falls on the plaintiff, in the context of Rule 4(k)(2) that general proposition would saddle the plaintiff with an extraordinary challenge in "proving a negative many times over," that is, demonstrating that the defendant is *not* subject to jurisdiction in each of the fifty states. *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1413 (Fed. Cir. 2009). We have therefore adopted a burden-shifting mechanism so that "if the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Id.* at 1415 (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001)).

During the contempt proceedings, Cipla identified the Northern District of Illinois as an alternate forum for suit and claimed that if it had been sued there "in October 2007 or 2008, Cipla would have agreed that there was personal jurisdiction." Appellants contend that this proclamation necessarily divested the district court of personal jurisdiction and consequently rendered the default judgment void. In contrast, Merial maintains, and the district court held, that the proper inquiry when a

defendant seeks to overturn a default judgment predicated on Rule 4(k)(2) by consenting to an alternate forum "is to determine whether the defaulted action could have been brought in that designated forum in the first place under that forum's long-arm jurisdiction." *Contempt Order*, 2011 WL 2489753, at *9. Finding that Illinois law would not have supported personal jurisdiction over Cipla in 2007 based on Cipla's contacts with Illinois at that time, the district court held that Rule 4(k)(2)'s negation requirement had been satisfied notwithstanding Cipla's post-judgment designation of an alternative forum. *Id.* We agree with the district court's analysis and conclusion.

The district court correctly concluded that Cipla's *ex post* consent to suit in the Northern District of Illinois was not independently sufficient to prevent it from exercising personal jurisdiction under Rule 4(k)(2). Discussing the negation requirement in *Touchcom*, we stated that a defendant can "avoid the application of [Rule 4(k)(2)] only when it designates a suitable forum in which the plaintiff *could have brought suit*." 574 F.3d at 1415 (emphasis added). Contrary to Cipla's contentions, a defendant cannot defeat Rule 4(k)(2) by simply naming another state; the defendant's burden under the negation requirement entails identifying a forum where the plaintiff *could have* brought suit—a forum where jurisdiction would have been proper at the time of filing, regardless of consent. Consistent with that obligation, a defendant does not identify "a more *appropriate* state" by suggesting an alternative forum with no basis for personal jurisdiction but for its consent. *Id.* at 1414 (quoting *ISI*, 256 F.3d at 552) (emphasis added). Absent some independent basis for jurisdiction, neither forum is manifestly more appropriate than the other in such situations, and we see little reason to conclude that the defendant's preference should prevail when choosing among districts of equivalent

jurisdictional competence based on equal contacts—or lack thereof—with the defendant.

In any event, we need not decide today the general requirements for a defendant to prevent the application of Rule 4(k)(2) by consenting to suit in another jurisdiction, for it suffices in this case to hold that a defendant, like Cipla, challenging a prior default judgment may not do so by naming another forum that would not have had an independent basis for jurisdiction at the time of the original complaint.  As the district court recognized, the incentives for gamesmanship under a contrary rule would be particularly acute in such cases because the defaulting party could use a simple, unilateral statement of consent not only to achieve transfer into a forum it considers more convenient (or less convenient for its opponent), but also to undo an adverse final judgment for the chance to litigate from a clean slate.  *See Contempt Order*, 2011 WL 2489753, at *9 ("Allowing a defendant to avoid the consequences of a default after the fact simply by professing that it will now consent to jurisdiction if the default is lifted creates an opportunity for mischief and manipulation of the courts.").  In sum, the district court applied the correct standard in evaluating a default judgment premised on Rule 4(k)(2) by requiring Cipla to identify an alternative forum where Merial could have brought suit in 2007.

In addition, we find no clear error in the district court's application of the foregoing principles to the facts of this case.  To support its claims that personal jurisdiction would have existed in Illinois, Cipla presented documents indicating that it had a relationship with an Illinois corporation dating to 2003, but that evidence contains only bare statements of expected collaboration and provides no details regarding the extent of any resulting contacts with Illinois by the time Merial filed suit.

Cipla also submitted evidence suggesting that it made "over 86 shipments or sales of products" to companies in Illinois in the past three years.  Br. Def.-Appellant Cipla at 32 (citing J.A. 2684–2808).  But that evidence does not show that any such shipments arrived in Illinois before Merial filed suit in November 2007,[5] nor does it provide any information on the revenue or sales generated by the listed shipments.  After conducting a careful analysis of the Illinois long-arm statute, the district court concluded that the evidence of alleged contacts provided an insufficient basis to conclude that Cipla would have been subject to personal jurisdiction in the Northern District of Illinois for the claims asserted in the 2007 complaint.  In view of the available evidence, that decision was not in error.

C

As a predicate to establishing personal jurisdiction, Rule 4(k)(2) also requires service of process or waiver of service, and Federal Rule of Civil Procedure 4(f) governs the requirements for serving a party in a foreign country.  Rule 4(f)(1) indicates that a party may be served outside of the United States by "internationally agreed means . . . such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents" ("the Hague Convention").  India became a signatory to the Hague Convention, effective August 1, 2007.  In so doing, India prohibited service through channels including mail and private process servers and instead required foreign plaintiffs to effect service through the Central Authority of India.  *See Tuckerbrook Alt. Invs., LP v. Banerjee*, 754 F. Supp. 2d 177, 181–82 (D. Mass. 2010).

---

[5]    In its analysis, the district court nonetheless treated three of those shipments as having occurred "during the time frame surrounding the filing of the Complaint."  *Contempt Order*, 2011 WL 2489753, at *9.

Appellants argue that exercising personal jurisdiction over Cipla pursuant to Rule 4(k)(2) would violate due process because Merial's 2007 service in India was legally deficient. Appellants allege that when it filed the 2007 complaint, Merial served Cipla in Mumbai via "courier and registered post" in an attempt to comply with Rule 4(f)(2)(A), but Rule 4(f)(2) generally applies only "if there is no internationally agreed means" of service. Because Merial bypassed the Central Authority of India, Appellants assert that Merial's service of process failed to meet mandatory standards under the Hague Convention and was therefore insufficient to support personal jurisdiction under Rule 4(k)(2). Accordingly, Appellants argue that the district court's 2008 default order and injunction must be vacated as void for lack of personal jurisdiction.

As Merial correctly notes, however, Appellants have raised the issue of insufficient service for the first time on appeal. As that contention surely could have been, but was not, presented in Cipla's Rule 60(b)(4) motion or raised before the district court during the subsequent contempt proceedings, we deem that argument waived and need not consider it here. *See SEC v. Internet Solutions for Bus. Inc.*, 509 F.3d 1161, 1167 (9th Cir. 2007).

D

In general, parties may satisfy federal pleading standards by alleging personal jurisdiction generally, without asserting a specific basis for the court's personal jurisdiction over a defendant. 4 Wright, et al., *supra*, § 1067.6. Furthermore, our precedent holds that Rule 4(k)(2) can be considered even when the plaintiff has affirmatively pled a different basis for personal jurisdiction. *See Touchcom*, 574 F.3d at 1410 ("The court did not examine whether Rule 4(k)(2) permitted the exercise of personal jurisdiction [because the plaintiff] did not allege that that rule permit-

ted the exercise of jurisdiction. However . . . we are entitled to consider it."); *see also ISI*, 256 F.3d at 551 ("Although the parties did not alert the district judge to Rule 4(k)(2) . . . . Federal courts are entitled to apply the right body of law, whether the parties name it or not.").

In the 2007 complaint, Merial alleged that the district court had "personal jurisdiction over CIPLA by virtue of its actions . . . within this State and judicial district, or its systematic and continuous contact with this State and judicial district," J.A. 837, and that allegation stood uncontested until the contempt proceedings arose several years later. In the contempt proceedings, Cipla argued, and the district court concluded, that the available record did "not support a finding that Cipla had sufficient contacts with the state of Georgia for it to be subject to personal jurisdiction under the Georgia long-arm statute for the present action," but the court agreed with Merial that it could evaluate whether its jurisdictional requirements had nonetheless been satisfied pursuant to Rule 4(k)(2). *Contempt Order*, 2011 WL 2489753, at *8 n.9 (citing *Touchcom*, 574 F.3d at 1415). Cipla argues that it was entitled to rely on the allegations evident from the face of Merial's complaint. Since the 2007 complaint recited a defective basis for jurisdiction, Cipla argues that it rightly declined to answer in the interest of forgoing futile litigation and that Rule 4(k)(2) should be unavailable until the default judgment is vacated and Merial's complaint is formally amended to provide Cipla with a full opportunity to respond on the merits. As explained below, we find those arguments unpersuasive.

As Cipla notes, "[a] defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982). Upon receiving a com-

plaint, defendants are of course entitled to evaluate the circumstances and forge their own strategic decisions; the soundness of those decisions, however, is another matter. *See* Restatement (Second) of Judgments, § 65 cmt. b. ("When the person knew about the action but perceived that the court lacked . . . jurisdiction, he is given a right to ignore the proceeding *at his own risk* but to suffer no detriment *if his assessment proves correct*.") (emphases added). Cipla essentially urges that, because the 2007 complaint did not refer to Rule 4(k)(2), the possibility of jurisdiction arising under that rule did not factor into its decision not to appear, and the district court's subsequent invocation of Rule 4(k)(2) as its basis for asserting personal jurisdiction constituted an unfair change in circumstances and therefore compels a return to square one in this litigation.

But such claims of reliance and unfair surprise ring hollow where, as here, it is beyond dispute that Cipla had actual notice of suit and chose to risk a default judgment, based on its subjective assessment of the complaint[6] and despite existing precedent indicating that Rule 4(k)(2) could apply whether or not it was raised by the parties. *See ISI*, 256 F.3d at 551. Regardless of the specific jurisdictional allegations in the 2007 complaint, Cipla should have apprehended that a Rule 4(k)(2) inquiry might arise, particularly as a foreign company believing itself to be outside the reach of the forum state's long-arm statute. Furthermore, even though Cipla's initial belief that the complaint recited an incorrect basis for jurisdiction was ultimately vindicated, that issue remained an open question at the time, and Cipla had the option of filing a pre-

---

[6]    *See, e.g.*, Br. Def.-Appellant Cipla at 20 ("As Cipla knew when it received the complaint . . . Merial's allegations of jurisdiction under the Georgia Long Arm statute were defective factually and as a matter of law . . . .").

answer motion under Rule 12(b)(2) to settle all issues of personal jurisdiction up front. Cipla instead chose to do nothing, and it must bear the consequences of that decision.

Cipla attempts to distinguish *Touchcom* on the basis that we were not reviewing a default judgment in that case, so vacatur was not necessary there for the plaintiff to amend its complaint on remand. Those distinctions are unavailing. In *Touchcom*, the plaintiffs pursued a legal malpractice claim against a Canadian law firm for alleged errors in prosecuting a U.S. patent, alleging that the governing state long-arm statute conferred personal jurisdiction on the district court in view of the defendant's contacts with the forum state. 574 F.3d at 1409–10. The district court dismissed for lack of personal jurisdiction because the plaintiffs had not pled sufficient facts to establish personal jurisdiction under state law. *Id.* at 1409. Although we agreed with the district court's analysis under state law, we nonetheless reversed and remanded on the basis that the district court could exert personal jurisdiction over the defendants pursuant to Rule 4(k)(2). *Id.* at 1411–12, 1418. Citing *ISI*, we held that Rule 4(k)(2) applied even though it had never been raised at any point prior to appeal, much less recited as a basis for jurisdiction in the plaintiffs' original complaint. *Id.* at 1410–11. Nowhere was our remand decision conditioned on subsequent formal amendments to the complaint—indeed, the issue was not even mentioned—and we do not read *Touchcom* as being so limited. Contrary to Cipla's contentions, the main distinction we see between the facts in *Touchcom* and the present dispute is that here Merial did raise Rule 4(k)(2) before the district court such that the parties were able to contest its application prior to appeal, which, if anything, favors Merial's position. We

therefore see no reason to distinguish *Touchcom* based on the facts of this case.

The Eleventh Circuit considered the retroactive application of Rule 4(k)(2) following a default judgment in *Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2009). In that case, a U.S. plaintiff brought suit against a foreign corporation to recover for injuries he suffered at a resort operated by the defendant in Costa Rica. The plaintiff's complaint alleged personal jurisdiction under the relevant state long-arm statute, and when the defendant did not appear, the district court entered a default judgment. *Id.* at 1215. The defendant later moved to set aside the default judgment for want of personal jurisdiction, and the plaintiff countered by raising Rule 4(k)(2) for the first time as an alternative basis for jurisdiction. *Id.* at 1216. Under circumstances thus very similar to the appeal before us, and without requiring amendment of the complaint, the Eleventh Circuit court performed a full Rule 4(k)(2) analysis. As Cipla points out, the court in *Oldfield* ultimately concluded that Rule 4(k)(2) did not support jurisdiction over the defendant. *Id.* at 1223–24; *see* Br. Def.-Appellant Cipla at 24–25. But that was because the substantive requirements of Rule 4(k)(2) had not been met, not because Rule 4(k)(2) had been omitted from the complaint. *See Oldfield*, 558 F.3d at 1223–24. As far as the propriety of considering Rule 4(k)(2) for the first time after a default judgment, *Oldfield* thus supports the district court's approach in this case.

Finally, we note that Cipla had a full opportunity to litigate over personal jurisdiction during the contempt proceedings, and, having lost on that issue, now insists that the default judgment must nonetheless be vacated because the basis for jurisdiction alleged in the 2007 complaint differed from the basis ultimately relied upon

by the district court. But the judgment's legal viability is not keyed to the particular grounds for personal jurisdiction set out in the complaint. The important question is whether the district court ultimately had actual jurisdiction over the parties. Once it received notice of suit in 2007, the choice was Cipla's whether the jurisdictional question should be settled then or at some point post-judgment. With the benefit of hindsight, Cipla would understandably prefer to turn back the litigation clock to reconsider that choice, but the district court's default judgment was premised on a valid exercise of personal jurisdiction under Rule 4(k)(2), and we therefore decline to upset its decision on that basis.

## II

Appellants next dispute the district court's decision to deny its request for a stay of the contempt proceedings pending resolution of the parallel Delaware action. The district court held that the "first-to-file" rule would not support a stay and, moreover, that the Delaware action was not in fact the first filed. *Contempt Order*, 2011 WL 2489753, at *1 n.3. Appellants contend that the district court should have issued a stay because the Delaware action was filed before Merial instituted the contempt proceedings and because the Delaware action raised pivotal questions of validity and infringement that warranted a full trial and could have rendered the contempt proceedings moot. Appellants thus ask that we vacate the district court's judgment and remand with instructions to stay further contempt proceedings pending a final determination on infringement and validity of the '329 patent in the Delaware action. This we decline to do.

The "first-to-file" rule is a doctrine of federal comity, intended to avoid conflicting decisions and promote judicial efficiency, that generally favors pursuing only the

first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions. *See generally Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937–38 (Fed. Cir. 1993); *Church of Scientology of Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 749–50 (9th Cir. 1979). The filing date of an action derives from the filing of the complaint. Fed. R. Civ. P. 3; *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 96 n.3 (9th Cir. 1982). Under the first-to-file rule, a district court may choose to stay, transfer, or dismiss a duplicative later-filed action, although there are exceptions and the rule is not rigidly or mechanically applied—"an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts." *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180,183–84 (1952).

As an initial matter, we disagree with Appellants' contention that the Delaware action antedates the matter now before us on appeal. Velcera filed its declaratory judgment complaint in Delaware on February 11, 2011, approximately six weeks before Merial moved on March 28, 2011, to hold Cipla in contempt. But the date of Merial's contempt *motion* is irrelevant in determining which *action* was filed first—what matters is the initiation of suit. Here, the contempt proceedings elaborated a preexisting case that originated with Merial's initial infringement complaint against Cipla, filed in November 2007. The district court thus correctly viewed the contempt proceedings as first filed. Furthermore, even if the Delaware action could be considered the first suit filed, the district court was well within its considerable discretion in concluding that principles of comity would not support a stay because the precise issues at stake differed between the proceedings, and a key party (Cipla) was absent from the Delaware action. *See Contempt Order*,

2011 WL 2489753, at *1 n.3. We therefore affirm the denial of Velcera's motion for stay.

## III

Appellants next urge reversal on grounds that the district court's analysis of PetArmor Plus failed to apply the correct standard for determining contempt based on a newly accused product. On review, and as described more fully below, we uphold the district court's judgment.

We have recently applied a modified analysis to contempt determinations in the context of alleged continuing infringement in violation of an injunction. Under *TiVo*, contempt requires proof that (1) the newly accused product is no more than colorably different from the previously adjudged infringing product, and (2) the newly accused product actually infringes the asserted patent. 646 F.3d at 882. The district court found that Merial satisfied both requirements as to PetArmor Plus in the contempt proceedings. *Contempt Order*, 2011 WL 2489753, at *11–12.

Appellants attack both findings as founded on inadequate evidence and reliant on unsustainable assumptions derived from the 2008 default judgment against Cipla. At the outset, Velcera complains that—as a non-party to the original default proceedings—it never received a full and fair opportunity to litigate various issues including whether the '329 patent is valid, whether Cipla's Protektor Plus product infringed the '329 patent, or whether Protektor Plus ever even existed. Those arguments are baseless. Velcera, as an unsolicited intervenor in this action, joined subject to all prior determinations of fact and law that preceded its intervention. *Knowles v. Bd. of Pub. Instruction of Leon Cnty.*, 405 F.2d 1206, 1207 (5th Cir. 1969). Patent validity and infringement by an originally accused product are generally not open to challenge in contempt proceedings, *Additive Controls II*, 154 F.3d

at 1350, and for purposes of this litigation, the 2008 default judgment against Cipla established, among other things, that the '329 patent was not invalid and was infringed by Cipla's Protektor Plus product. In short, the time for contesting those underlying determinations has passed, and we will not consider them anew in this appeal.

Appellants next argue that the district court could not competently evaluate whether colorable differences exist between PetArmor Plus and Protektor Plus because the default judgment allegedly offered no guidance on which specific features of Protektor Plus were focused on to establish infringement. In support of its position, Appellants rely on our statement in *TiVo* that "one should focus on those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims." 646 F.3d at 882. Again insisting that Merial never "proved" infringement by Protektor Plus, Appellants argue that the colorable differences analysis did not rest on affirmatively adjudged infringing features.

We conclude that the district court applied the correct standards and committed no clear error in finding no more than colorable differences between PetArmor Plus and Protektor Plus. In contempt proceedings following a contested infringement action, as in *TiVo*, it will often be that the underlying infringement litigation focused detailed attention on a few heavily disputed claim limitations and certain corresponding elements of an infringing product, and the colorable differences analysis in such cases will benefit from that precision. But when, as here, infringement has been established through default, the judgment is no less binding or authoritative simply because comprehensive and painstaking factual analyses regarding every claim limitation may have been unneces-

sary or impractical at the time of the initial decision. As such, whether or not the default order here included an exhaustive infringement analysis, it necessarily and conclusively established that Protektor Plus met each limitation recited in the asserted claims of the '329 patent. For example, claim 1 of the '329 patent requires a spot-on pest control composition comprising (1) a synergistic effective amount of fipronil, (2) a synergistic effective amount of an IGR, and (3) at least one customary spot-on formulation adjuvant. '329 patent col.10 ll.11–15. The evidence showed that Protektor Plus contained 9.7% fipronil, 11.8% methoprene, and at least one customary spot-on adjuvant—all of which Cipla admitted by default in 2008. *Contempt Order*, 2011 WL 2489753, at \*6. By comparison, the district court found during the contempt proceedings that PetArmor Plus for cats contains 9.8% fipronil, 11.8% methoprene, and at least one customary spot-on adjuvant. *Id.* at \*12. Furthermore, the court credited Merial's expert testimony that any two spot-on adjuvants would function interchangeably and that replacing one for another in any such pest control composition would not amount to a colorable difference. *Id.* The district court thus had ample basis to conclude that PetArmor Plus and Protektor Plus are not more than colorably different.

Appellants also fault the district court's conclusion that PetArmor Plus infringes the '329 patent. Appellants argue that the district court relied on inadequate evidence and erroneously compared PetArmor Plus to Merial's Frontline Plus rather than the '329 patent claims themselves.

It is undisputed that Merial's Frontline Plus product is covered by the '329 patent's claims, and, contrary to the Appellants' contentions, "[o]ur case law does not contain a blanket prohibition against comparing the accused prod-

uct to a commercial embodiment" in an infringement analysis. *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1288 (Fed. Cir. 2010). The district court thus elected to compare the accused product to Frontline Plus, and we see no error in that decision, particularly given its context in a summary contempt proceeding where such an approach would be especially convenient or expeditious and the benchmark commercial product represents a recognized embodiment of the patent at issue. On the merits, the district court considered undisputed evidence that PetArmor Plus contains precisely the same concentrations of fipronil and methoprene as Frontline Plus, and that those concentrations constitute synergistically effective amounts as recited in the claims. Indeed, Velcera not only represented to the EPA that PetArmor Plus is essentially identical to Frontline Plus, but also explicitly traded on the products' equivalence. *See, e.g.*, J.A. 6745, 6753–54 (PetArmor Plus packaging prominently stating "COMPARE TO FRONTLINE PLUS – same active ingredients," and PetArmor Plus promotional materials emphasizing identity between the PetArmor Plus and Frontline Plus formulations). Further, Merial highlighted trial testimony in which Dennis Steadman, Velcera's CEO, "readily admitted at the hearing that if the '329 Patent is valid, then PetArmor Plus violates that Patent." *Contempt Order*, 2011 WL 2489753, at *12. That testimony was as follows:

> THE COURT: Mr. Steadman, let me just make sure I understand one thing you testified to. I understand that you made the conscious decision that PetArmor Plus you did not feel violated the '329 patent because you believed the '329 patent was invalid. Correct?
>
> THE WITNESS: That's correct.

THE COURT: If—and I know you don't agree with this. But if the '329 patent were valid, then you would acknowledge that PetArmor Plus would infringe on that patent, if it were valid.

THE WITNESS: If it were valid, that combination, I—yeah, I believe would.

. . . .

THE COURT: You're betting the store on the invalidity of the '329 patent.

THE WITNESS: You betcha.

J.A. 4903–06. One would be hard-pressed to conceive of more compelling testimonial evidence on infringement, particularly when those statements come from the defendant's chief executive regarding his own product. In assessing whether PetArmor Plus infringes the '329 patent, the district court thus had before it considerable evidence indicating infringement, and we discern no error in its affirmative conclusion on the basis of that evidence. In view of the foregoing, the district court appropriately considered both prongs of the contempt analysis as required under *TiVo*, and its conclusions were not clearly erroneous.

IV

The Appellants' next argument raises territoriality concerns with the district court's contempt judgment, emphasizing that Cipla restricted its involvement in the PetArmor Plus venture to activities in India. After analyzing Cipla's role in the development, manufacture, and distribution of PetArmor Plus, the district court nonetheless concluded that Cipla had contemptuously "caused an infringing product to be sold in the United States, in direct violation of the Court's March 6, 2008 order."

*Contempt Order*, 2011 WL 2489753, at *13. According to Appellants, the district court thereby overextended U.S. law to penalize Cipla for conduct that occurred entirely overseas. We find no such extraterritorial infirmity in the judgment, as described more fully below.

Appellants first advance the blanket proposition that domestic patent law does not, and was not intended to, reach past the territorial limits of the United States. According to Appellants, "decades of precedent" hold that extraterritorial conduct cannot constitute patent infringement under 35 U.S.C. § 271. Br. Def.-Appellant Velcera at 26–27 (citing *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972); *Brown v. Duchesne*, 60 U.S. 183 (1856); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246 (Fed. Cir. 2000)); Br. Def.-Appellant Cipla at 45–48 (same). Merial responds that foreign acts can violate U.S. patent law if, like Cipla's, they induce acts of direct infringement within the United States.

Although we recognize the fundamental territoriality of U.S. patent law, *see Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007), Cipla's alleged foreign conduct is not necessarily outside the scope of § 271. To be sure, purely extraterritorial conduct cannot constitute *direct* infringement of a U.S. patent, as § 271(a) includes express language limiting its scope to domestic acts: "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, *within the United States*, or imports *into the United States* any patented invention during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271(a) (2006) (emphases added). Consistent with this principle, all of the decisions cited by Appellants concerned claims for direct infringement and therefore required an infringing act within the United States. *See Deepsouth*, 406 U.S. at 527 ("to secure the injunction it seeks, Laitram must show a § 271(a) direct infringement

by Deepsouth in the United States"); *Brown*, 60 U.S. at 193 ("The declaration . . . alleges that the defendant used [the invention] without his consent."); *Rotec*, 215 F.3d at 1251 ("According to Rotec, Defendants violated § 271(a) when they 'offered to sell' the invention . . . ."). While those decisions thus support the proposition that § 271(a) direct infringement claims require domestic infringing acts, § 271(a) is not the only provision of § 271. In particular, § 271(b), which defines infringement by inducement, contains no such territorial proscription. *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."). Section 271(b) therefore does not, on its face, foreclose liability for extraterritorial acts that actively induce an act of direct infringement that occurs within the United States, and Appellants cite no authority to that effect. We therefore decline to read the statute as being so limited.

In short, where a foreign party, with the requisite knowledge and intent, employs extraterritorial means to actively induce acts of direct infringement that occur within the United States, such conduct is not categorically exempt from redress under § 271(b). *Cf. DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305–06 (Fed. Cir. 2006) (en banc in relevant part) (approving of a jury instruction that read, in part: "Unlike direct infringement, which must take place in the United States, induced infringement does not require any activity by the indirect infringer in this country, so long as the direct infringement occurs here."). We therefore reject the Appellants' overbroad contention that acts outside of the United States cannot violate any provision of § 271.

Appellants next argue that, even if foreign activities can give rise to liability in some circumstances, our decision in *International Rectifier Corp. v. Samsung Electronics Co.*, 361 F.3d 1355 (Fed. Cir. 2004), prohibits a

contempt finding in this case. More specifically, Appellants argue that their layered contractual arrangements and elaborate distribution chain—by which they sought to insulate themselves from one another through foreign, allegedly independent intermediaries—mirror those that on their facts precluded a contempt judgment in *International Rectifier*.

Appellants' reliance on *International Rectifier* is misplaced. In *International Rectifier*, the district court had enjoined a foreign manufacturer from "making, using, offering for sale or selling in or importing into the United States" a patented computer component. 361 F.3d at 1360. The enjoined foreign manufacturer then contracted with a German company to make, sell, and deliver unfinished versions of the patented component outside of the United States, after which the German company finished and packaged the patented components for sale to its customers around the world, including in the United States. *Id.* at 1358. Although the district court held the manufacturer in contempt for violating the injunction, we reversed, holding that the manufacturer's extraterritorial conduct had not violated the injunction and that there was no basis for attributing the German company's independent actions to the manufacturer. *Id.* at 1360–62. But our decision in *International Rectifier* turned on the specific terms of the injunction there at issue, which "track[ed] section 271(a) of the Patent Act" and therefore prohibited only direct infringement and could not reach extraterritorial activities. *Id.* at 1360. In contrast, Cipla's current overseas activities are not necessarily outside of the broader injunction now before us, which prohibits not only direct infringement, but also "any act that . . . *causes or induces* infringement" of the '329 patent. *Contempt Order*, 2011 WL 2489753, at *12. And, unlike in *International Rectifier*, it is therefore unneces-

sary to establish whether Cipla exerted control over the allegedly independent actions of Omnipharm and/or QEDetal, for Cipla's own extraterritorial conduct can violate the present injunction as indirectly infringing pursuant to § 271(b). *International Rectifier* therefore does not preclude a finding of contempt in this case.

Finally, Cipla contends that the district court's contempt order lacks any findings on or meaningful discussion of indirect infringement and argues that the district court applied an inadequate inducement analysis. According to Cipla, the district court's conclusion that Cipla "caused" Velcera's infringement cannot be sustained as a basis for contempt because it falls short of sufficient factual findings and misstates the correct legal standard on inducement. We disagree.

Regardless of the precise language used to frame the issue, the substance of the district court's analysis is clear—Cipla violated the injunction because, at a minimum, its involvement in the PetArmor Plus venture induced infringement of the '329 patent. To support a finding of inducement under § 271(b), the accused infringer must have knowingly and intentionally induced another party's direct infringement. *Global-Tech Appliances, Inc. v. SEB, S.A.*, 563 U.S. __, 131 S.Ct. 2060, 2068 (2011); *DSU*, 471 F.3d at 1306. Here, the district court explicitly found that (1) PetArmor Plus infringes the '329 patent; (2) Velcera sold PetArmor Plus in the United States; (3) Cipla and Velcera were aware of the '329 patent and the 2008 injunction; (4) Cipla played fundamental roles in manufacturing, packaging, and assisting in the development of the PetArmor Plus product for Velcera to sell in the United States; (5) Cipla knew that PetArmor Plus was to be sold in the United States; and (6) Cipla knew and intended that such sales would infringe the '329 patent. Those findings bear directly on the

question of inducement, and they are not clearly erroneous.

Nor can we say that those findings are inadequate to support a finding of inducement or that the district court erred in its ultimate conclusion that Cipla "caused an infringing product to be sold in the United States" in direct violation of the injunction. *Contempt Order*, 2011 WL 2489753, at \*13. Although Cipla complains that the district court's use of the term "caused" signals the application of an incorrect standard for inducement, the contempt order simply reflects the language of the injunction itself, which is central to the contempt analysis and uses the terms "cause" and "induce" interchangeably to describe prohibited indirectly infringing conduct.[7] Accordingly, we understand the district court's conclusion that "Cipla caused an infringing product to be sold in the United States, in direct violation of the Court's March 6, 2008 Order," *id.*, to mean that Cipla violated the injunction's prohibition against any act that induces infringement of the '329 patent. We affirm it as such.

---

[7] By its terms, the 2008 injunction proscribed both direct infringement and inducement, banning Cipla from "committing any act that *infringes* or *causes or induces* infringement of any claim of the '940 or '329 patents." *Contempt Order*, 2011 WL 2489753, at \*2 (emphases added). Regarding the latter, the terms "induces" and "causes" are introduced in the alternative, while "causing" predominates throughout the remainder of the injunction as prohibited directly and indirectly infringing acts are alternately enumerated, for example, "using, *causing* to be used, selling, *causing* to be sold, offering for sale, and *causing* to be offered for sale . . . importing and *causing* to be imported." *Id.* (emphases added).

V

Velcera next contends that even if Cipla's conduct violated the 2008 injunction, the district court committed independent error by also finding Velcera—a non-party to the 2008 default judgment—in contempt for working in "active concert or participation" with Cipla to violate the 2008 injunction. We disagree.

It is well recognized that courts may not enter injunctions against persons or entities that were not party to the litigation before them. A soundly issued injunction can, however, affect such non-parties in at least two important respects—those who are legally identified with an enjoined party may be bound as if they themselves were named in the injunction, and those who act in concert with an enjoined party to assist in violating the injunction may also be held in contempt. Fed. R. Civ. P. 65(d); *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394–95 (Fed. Cir. 1996) ("*Additive Controls I*"). For the latter "active concert" form of liability, a non-party to an injunction may not be held in contempt for its wholly independent conduct; the law limits contempt liability to non-parties that "act with an enjoined party to bring about a result forbidden by the injunction . . . if they are aware of the injunction and know that their acts violate the injunction." *Additive Controls II*, 154 F.3d at 1353.

Velcera posits that the district court erred by failing to separately analyze its individual actions under the aiding and abetting standard, calling repeated attention to what it calls the "bona fide legal and business relationships" that separated Velcera from Cipla in the development, production, and sale of PetArmor Plus. Under a proper analysis, according to Velcera, its "arms-length" business relationship and lack of a direct contractual

relationship with Cipla evince independent activity undertaken for purposes other than assisting Cipla in efforts to violate the injunction.

In determining that Velcera acted in concert with Cipla, the district court relied in part on Velcera's admissions that by the time of its infringing acts it was aware of the '329 patent, knew PetArmor Plus would infringe the '329 patent (apart from its subjective belief that the '329 patent was invalid), and had notice of the 2008 injunction against Cipla. There is thus little room to dispute that, as it cooperated with and relied on Cipla in its efforts to bring PetArmor Plus to market, Velcera was aware of the existing injunction and understood that acting in concert with Cipla to market an infringing product (like PetArmor Plus) would violate the injunction. As to whether Velcera in fact worked in active concert with Cipla with the common aim of evading the injunction, Velcera attempts to couch its complaints in terms of legal error— that the district court ignored its independent, arms-length arrangements with Cipla—but its argument in reality boils down to disagreement with the factual conclusions the district court drew from those relationships. The district court clearly contemplated the structure of Velcera's interactions with Cipla—it heard extensive testimony from Velcera's CEO detailing the relationships, roles, and specific contractual agreements among the various players in the PetArmor Plus venture, and the court recounted those arrangements in the contempt order. The district court thus appreciated and accepted Velcera's account regarding the formal legal and business relationships behind PetArmor Plus; its view simply diverged from Velcera's narrative as to the true nature of those relationships: "Clever lawyers cannot shield the true substance of the contumacious conduct, no matter how many different entities attempt to launder Cipla's

fingerprints off the product." *Contempt Order*, 2011 WL 2489753, at *6.

Our task on appeal is not to determine whether that factual conclusion was correct, but rather whether it was clearly erroneous. *Additive Controls II*, 154 F.3d at 1351 ("We review . . . factual findings in contempt proceedings for clear error."). Conclusive documentary evidence on issues rooted in subjective intent is not always readily apparent, but here the district court considered the complex, multilayered relationships that linked Velcera and Cipla in the production of PetArmor Plus. In view of both parties' admitted knowledge of the injunction and their obvious incentives to evade it, the district court interpreted those relationships as designed primarily to obfuscate illicit and intentional concerted action rather than as bona fide, constructive business arrangements. Having reviewed the same record, we do not view that conclusion as clearly erroneous, and Velcera's arguments and self-serving testimonial evidence to the contrary are insufficient to persuade us otherwise. Accordingly, we affirm the district court's decision to hold Velcera in contempt as a non-party working in active concert with Cipla to violate the 2008 injunction.

## VI

Finally, Appellants argue that even if they violated the district court's 2008 injunction by bringing PetArmor Plus to market in the United States, it was nevertheless inappropriate to permanently enjoin sales of PetArmor Plus in the contempt judgment because, *inter alia*, the balance of hardships allegedly weighs in their favor and Merial allegedly failed to establish irreparable injury. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).

On the balance of hardships, Velcera contends that the district court ignored its small size relative to Merial, which, if properly considered, would tip the balance of hardships in its favor. While an injunction would have a crippling effect on its business, Velcera suggests that continued infringing sales of PetArmor Plus "would not seriously threaten Merial's future." The district court, however, expressly considered and ultimately discounted that argument,[8] as was properly within its discretion. As we have noted, "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008); *see also Polaroid Corp. v. Eastman Kodak Co.*, No. 76-1634-Z 1985, U.S. Dist. LEXIS 15003, at *6, 9 (D. Mass. Oct. 11, 1985) ("To the extent that Kodak has purchased that success at Polaroid's expense, it has taken a 'calculated risk' that it might infringe existing patents. . . . Public policy favors the innovator, not the copier."). As to irreparable harm, the district court concluded that the introduction of PetArmor Plus as a generic competitor to Frontline Plus would result in considerable lost market share and price erosion, thus favoring the entry of a permanent injunction. That does not amount to clear error, particularly in view of evidence that Velcera's marketing strategy was geared specifically to target Frontline Plus by touting PetArmor Plus as a cheaper but otherwise equal alternative. We therefore decline to disturb the district court's

---

[8] *See Contempt Order*, 2011 WL 2489753, at *15 ("In this case, the law requires the Court to issue a ruling with potentially devastating consequences for Velcera. To fail to follow the law, however, and favor Velcera because of personal sympathy toward the plight of a fledgling company, would be exponentially more tragic.").

injunction against the further infringing distribution of PetArmor Plus.

## CONCLUSION

In sum, we conclude that (1) the 2008 default judgment against Cipla rested on a valid exercise of personal jurisdiction; (2) the district court did not abuse its discretion by declining to stay the contempt proceedings in view of the then-pending Delaware action; (3) the district court did not clearly err in determining that PetArmor Plus infringes the '329 patent and is not more than colorably different from Cipla's previously enjoined Protektor Plus product; (4) Cipla's extraterritorial role in the development, production, and ultimate U.S. sale of PetArmor Plus violated the district court's injunction against induced infringement of the '329 patent; (5) Velcera's actions bringing PetArmor Plus to market in concert with Cipla qualified as contemptuous conduct despite its status as a non-party to the 2008 default judgment; and (6) the district court did not abuse its discretion in prohibiting further sales of PetArmor Plus. We have considered each of the remaining arguments advanced by the Appellants and find them to be without merit. Because we find no reversible error in our review of the contempt proceedings, we affirm the judgment of the district court.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

_____

**MERIAL LIMITED** AND **MERIAL SAS,**
*Plaintiffs-Appellees,*

**and**

**BASF AGRO B.V.,**
*Plaintiff,*

v.

**CIPLA LIMITED,**
*Defendant-Appellant,*

**and**

**VELCERA, INC.** AND **FIDOPHARM, INC.,**
*Defendants-Appellants,*

**and**

**ARCHIPELAGO SUPPLIERS, ARROWTARGET
ENTERPRISES LTD.,
GENERIC PETMEDS, INHOUSE DRUGSTORE,
LISA PERKO,
PETCARE PHARMACY,** AND **PETMEDS R US,**
*Defendants.*

_____

2011-1471, -1472

_____

Appeals from the United States District Court for the
Middle District of Georgia in Case No. 07-CV-0125, Judge
Clay D. Land.

_____

SCHALL, *Circuit Judge*, dissenting.

Because I believe that the United States District Court for the Middle District of Georgia erred in not allowing Cipla Limited ("Cipla") to designate the Northern District of Illinois as a substitute forum for suit against it, I respectfully dissent from the decision of the majority affirming the district court's exercise of personal jurisdiction over Cipla. I would reverse the decision of the court and would vacate the contempt order and underlying default judgment against Cipla. I also would vacate the injunction against Cipla, Velcera, Inc. ("Velcera"), and Fidopharm, Inc. ("Fidopharm"). Finally, I would remand to the district court with the instruction that it transfer the case to the United States District Court for the Northern District of Illinois.

I.

In the district court, Cipla responded to Merial Limited's and Merial SAS's (collectively, "Merial") motion for contempt by moving to vacate the 2008 default judgment against it. In its motion, Cipla argued that the judgment was void because, when it was entered, Cipla was not subject to the personal jurisdiction of the court. In response to the motion, Merial alleged, for the first time, Rule 4(k)(2) as an alternate basis for jurisdiction. In ruling on Cipla's motion, although the district court determined that, in 2008, Cipla had not been subject to personal jurisdiction under Georgia's long-arm statute, it determined that Cipla had been subject to personal jurisdiction under Rule 4(k)(2). *Contempt Order*, 2011 WL 2489753, at *9.

The district court first noted that, when Cipla was sued in 2007, it did not designate a substitute forum in

which the action could be brought, and that it was not until Cipla filed its reply in response to Merial's opposition to its motion to vacate the default judgment that it designated Illinois as a substitute forum. *Id.* at *8. Under these circumstances, the court stated, it was not enough that Cipla now consented to personal jurisdiction in Illinois. Rather, it was necessary to determine whether suit could have been brought in Illinois in 2007:

> The Court finds that Cipla's "after the fact" willingness to consent to jurisdiction in Illinois so that it may vacate a previously entered default judgment is not sufficient to support a finding that it could have been sued in another state and thus avoid Rule 4(k)(2) jurisdiction. Instead the Court finds that Rule 4(k)(2) requires a determination of whether an Illinois court could have exercised personal jurisdiction over Cipla at the time the Complaint in this action was filed absent consent to jurisdiction by Cipla.

*Id.* at *9. *See also id.* ("The Court finds that the proper inquiry in a case where a defendant seeks to avoid a default judgment due to lack of personal jurisdiction by designating a forum where it is subject to jurisdiction pursuant to Rule 4(k)(2) is to determine whether the defaulted action could have been brought in that designated forum in the first place under that forum's long-arm jurisdiction."). Examining what it understood to be the state of Cipla's contacts with Illinois in 2007, the court concluded that Merial had carried its burden "of demonstrating that Cipla would not have been subject to personal jurisdiction in . . . 2007 in Illinois under Illinois law." *Id.* Accordingly, the court found that Cipla "was not subject to any state's courts of general jurisdiction under Rule 4(k)(2)."

## II.

In affirming the decision of the district court, the majority observes that it "need not decide . . . the general requirements for a defendant to prevent the application of Rule 4(k)(2) by consenting to suit in another jurisdiction . . . ." Maj. op. at 15. The majority states that "it suffices in this case to hold that a defendant, like Cipla, challenging a prior default judgment may not do so by naming another forum that would not have had an independent basis for jurisdiction at the time of the original complaint." *Id.* Starting from that premise, the majority agrees with the district court that, Cipla's consent notwithstanding, it was necessary to determine whether, in 2007, personal jurisdiction over Cipla existed under the Illinois long-arm statute, and the majority finds no error in the district court's analysis under that statute. Maj. op. at 16-17. Significantly, the majority rejects Cipla's argument that it was entitled to rely on the allegations in Merial's 2007 complaint, which did not mention Rule 4(k)(2) as a basis for personal jurisdiction, but, instead, recited jurisdiction based solely upon Georgia's long-arm statute. Complaint at ¶14, *Merial Ltd. v. Cipla Ltd.*, No. 3:07-CV-125 (CDL) (M.D. Ga. Nov. 13, 2007). The majority reasons that

> [r]egardless of the specific allegations in the 2007 complaint, Cipla should have apprehended that a Rule 4(k)(2) inquiry might arise, particularly as a foreign company believing itself to be outside the reach of the forum state's long-arm statute. Furthermore, even though Cipla's initial belief that the complaint recited an incorrect basis for jurisdiction was ultimately vindicated, that issue remained an open question at the time, and Cipla had the option of filing a pre-answer motion under Rule 12(b)(2) to settle all issues of personal juris-

diction up front. Cipla instead chose to do nothing, and it must bear the consequences of that decision.

Maj. op. at 20.

## III.

I am dissenting because, in my view, the majority affirms a decision of the district court which rests upon two fundamental errors. As I explain below, I believe that the district court erred in holding that Cipla could not designate Illinois as a substitute forum because it had failed to do so in 2007. I also believe that the district court erred in requiring a determination that the 2007 action could have been brought in Illinois in the first place under the Illinois long-arm statute.

## A.

Turning to the first point, I begin with the principle, which the majority recognizes, that "[a] defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." *Ins. Corp of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706, 102 S. Ct. 2099, 2106, 72 L. Ed. 2d 492, 504 (1982). *See Baragona v. Kuwait Gulf Link Transp. Co.*, 594 F.3d 852, 854-55 (11th Cir. 2010) (holding that defendants had not waived personal jurisdiction defense to default judgment despite allegations of defendants' "'lawyerly gamesmanship' in ignoring valid service, retaining counsel in the United States, [and] monitoring court proceedings"); *Oldfield v. Pueblo De Bahlia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2009) (vacating default judgment because of lack of personal jurisdiction); *Jackson v. FIE Corp.*, 302 F.3d 515, 523 (5th Cir. 2002) ("[A] party's right to object to personal jurisdiction is waived

under Rule 12(h) [of the Federal Rules of Civil Procedure] if such party fails to assert that objection in his first pleading or general appearance. But a party's right to contest personal jurisdiction is not waived by his failure to appear at all.") (footnote omitted); *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 413 (4th Cir. 2002) (citing *Ins. Corp. of Ireland, Ltd.*); *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987) ("When [a] person [named as a defendant] kn[o]w[s] about the action but perceive[s] that the court lack[s] territorial or subject matter jurisdiction, he is given a right to ignore the proceeding at his own risk but to suffer no detriment if his assessment proves correct.") (quoting Restatement (Second) of Judgments § 65, cmt. b (1982)).

In my view, for the following reasons, this principle applies with particular force in this case: (1) Merial at all times had the burden of making out a *prima facie* case of personal jurisdiction over Cipla. *See Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1410 (Fed. Cir. 2009) (holding that in the absence of an evidentiary hearing, plaintiff must make a *prima facie* showing of personal jurisdiction); *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006) (Plaintiff "has the burden of establishing a prima facie case of personal jurisdiction.) (citing *Meier ex. rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268-69 (11th Cir. 2002)); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997) ("The plaintiff, moreover, has the burden of demonstrating the existence of personal jurisdiction.); (2) jurisdiction over Cipla under Georgia's long-arm statute was the sole basis for personal jurisdiction asserted by Merial in its 2007 complaint; (3) it has been determined – and Merial has not challenged the determination – that personal jurisdiction over Cipla did not lie under Georgia's long-arm statute, which, again, was the

sole basis asserted in the 2007 complaint; and (4) it was not until Merial filed its response to Cipla's motion to vacate that Merial invoked Rule 4(k)(2), at which point Cipla promptly designated Illinois as a substitute forum. *See Oldfield*, 558 F.3d at 1218 n.22 (implicitly recognizing that, even after a default judgment, an alternative forum may be identified). I thus believe that the district court erred in penalizing Cipla for not designating Illinois as a substitute forum prior to the time Rule 4(k)(2) was first asserted by Merial. Put most simply, I believe that because Merial had the burden of establishing personal jurisdiction and because Cipla was entitled to ignore what it viewed as a defective basis for such jurisdiction stated in the 2007 complaint, it was error not to allow Cipla to designate a substitute forum the first time Rule 4(k)(2) was asserted as the ground for personal jurisdiction over it.

The district court criticized Cipla – and the majority joins in that criticism – for not having sought to consent to jurisdiction in the Northern District of Illinois when it was sued in 2007. Thus, the district court looked askance at what it characterized as "Cipla's 'after the fact' willingness to consent to jurisdiction in Illinois so that it may vacate a previously entered default judgment." *Contempt Order*, 2011 WL 2489753, at *9. For its part, as noted above, the majority states that "Cipla should have apprehended that Rule 4(k)(2) might arise" and that Cipla "had the option of filing a pre-answer motion under Rule 12(b)(2) to settle all issues of personal jurisdiction." Maj. Op. at 20. Finally, the majority points to *Touchcom*, 574 F.3d at 1415, and states that, in that case, "we held that Rule 4(k)(2) applied even though it had never been raised at any point prior to appeal, much less recited as a basis for jurisdiction in the plaintiffs' original complaint." Maj. op. at 21.

The difficulty I have with both the district court's and the majority's position is that, I believe, both positions ignore what was said in *Ins. Corp. of Ireland, Ltd.*: "A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." 456 U.S. at 706, 102 S. Ct. at 2106, 72 L. Ed. 2d at 504. That is precisely what Cipla did here. In other words, both the district court and the majority are critical of Cipla for following a course of action which the Supreme Court has expressly stated was available to it. In my view, this is incorrect.

I also do not agree with the majority's view that "Cipla should have apprehended that Rule 4(k)(2) might arise," which, I think, ignores the allegations in the 2007 complaint. In that complaint, Merial alleged that the defendants had contacts with Georgia sufficient to support personal jurisdiction under Rule 4(k)(1) by virtue of their sales to the state of Georgia.[1] These factual allegations precluded the assertion of personal jurisdiction under Rule 4(k)(2), which requires that "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." F.R.C.P. 4(k)(2)(A). I do not believe Cipla should have been on notice of the application of Rule 4(k)(2) when the allegations in the complaint precluded the application of Rule 4(k)(2).

At the same time, I am not persuaded by the majority's reliance on Rule 12(b)(2) and its citation to *Touchcom*. It is true that Rule 12(b)(2) states that a party "may assert" by motion the defense of lack of personal jurisdic-

---

[1]    Notably, in 2007, Merial elected not to plead the application of Rule 4(k)(2) in the alternative, as specifically contemplated by this Court in *Touchcom*. 574 F.3d at 1415.

tion.  The critical words are "*may assert*," however. The rule is not mandatory.  As discussed, Cipla had the option, which it pursued, of ignoring the 2007 suit in Georgia and later challenging any default judgment in a collateral proceeding.  As far as *Touchcom* is concerned, I have no quarrel with the majority's reading of the case insofar as it indicates that Rule 4(k)(2) may apply whether or not it is raised by the parties.  But that is not the issue here.  I see no error in the district court having allowed Merial to assert Rule 4(k)(2) for the first time in the contempt proceeding.  The error I see was not allowing Cipla, in the face of that assertion, to designate a substitute forum.

B.

As noted above, the district court stated that "Rule 4(k)(2) requires a determination of whether an Illinois court could have exercised personal jurisdiction over Cipla at the time the Complaint in this action was filed absent consent to jurisdiction by Cipla." *Contempt Order*, 2011 WL 2489753, at *9.  The majority agrees with the district court; it states:

> Contrary to Cipla's contentions, a defendant cannot defeat Rule 4(k)(2) by simply naming another state; the defendant's burden under the negation requirement entails identifying a forum where the plaintiff *could have* brought suit – a forum where jurisdiction would have been proper at the time of filing, regardless of consent.  Consistent with that obligation, a defendant does not identify "a more *appropriate* state" by suggesting an alternative form with no basis for personal jurisdiction but its consent.

Maj. op. at 15. Thus, both the district court and the majority take the position that, Cipla's consent to jurisdiction in

Illinois notwithstanding, it was necessary to determine that suit could have been brought in Illinois in the first place under its long-arm statute. I do not believe that the law supports this requirement.

In *Touchcom*, we stated that "a court is entitled to use Rule 4(k)(2) to determine whether it possesses personal jurisdiction over the defendant unless the defendant names a state in which the suit can proceed." 574 F.3d at 1414. We then proceeded to adopt the approach set forth by the Seventh Circuit in *ISI International, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551-52 (7th Cir. 2001). There, the court stated:

> A defendant who wants to preclude the use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction unlike federal subject-matter jurisdiction is waivable). If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).

256 F.3d at 552 (citations omitted). *See Touchcom*, 574 F.3d at 1415 ("We conclude that the approach articulated by the Seventh Circuit is . . . in tune with the purposes behind the enactment of Rule 4(k)(2)."). *See also Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1272 (Fed. Cir. 2010) (citing *Touchcom* and stating that the Federal Circuit has "adopted the Seventh Circuit's approach that allows a district court to use Rule 4(k)(2) whenever a foreign defendant contends that he cannot be sued in the forum state and *refuses to identify any other state where suit is possible*." (emphasis added).

The reason I disagree with the district court and the majority is that I am unable to identify any support for imposing the requirement that, before a party in Cipla's situation may consent to personal jurisdiction in a substitute forum, it must be demonstrated that suit could have been brought in that forum in the first place absent the party's consent. That such support is lacking is not, I think, surprising. In *Ins. Corp. of Ireland, Ltd.*, the Supreme Court discussed the difference between subject-matter jurisdiction and personal jurisdiction. After noting that subject-matter jurisdiction is an Article III requirement and "functions as a restriction on federal power and contributes to the characterization of the sovereign[,]" the Court stated that "no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant." 456 U.S. at 702, 102 S. Ct. at 2104, 72 L. Ed. 2d at 500-01. On the other hand, the Court stated, "[t]he requirement that a court have personal jurisdiction flows not from [Article III] but from the Due Process Clause. The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Id.*, 102 S. Ct. at 2104, 72 L. Ed. 2d at 501 (footnote omitted). The Court concluded that "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Id.* at 703, 102 S. Ct. at 2105, 72 L. Ed. 2d at 502. Notably, after making this statement, the Court cited to *McDonald v. Mabee*, 243 U.S. 90, 37 S. Ct. 343, 61 L. Ed. 608 (1917), where, it stated, "the Court indicated that regardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance." *Id.*, 102 S. Ct. at 2105, 72 L. Ed. 2d at 502. Significantly, in *ISI International*, whose approach we have adopted, the court relied on this aspect of per-

sonal jurisdiction when it stated that "[a] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction unlike federal subject matter jurisdiction is waivable)." 256 F.3d at 552. *See, e.g.*, *Bradford*, 603 F.3d at 1271-2 (stating that jurisdiction may lie over defendant simply by its acknowledgment in the briefing on appeal that it is subject to jurisdiction in Michigan); *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1200 (8th Cir. 1990) (stating "consent is a valid basis of personal jurisdiction, and resort to minimum-contacts or due process analysis to justify the jurisdiction is unnecessary." (citing *Ins. Corp. of Ireland, Ltd.*, 456 U.S. at 703, 102 S. Ct. at 2105, 72 L. Ed. 2d at 502.); *SEC v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir. 1979) ("A defendant cannot waive his right to assert a lack of subject matter jurisdiction, but he can confer jurisdiction over his person upon a court otherwise lacking that jurisdiction by expressly consenting to it."). In my view, because the rule that allows a party to defeat Rule 4(k)(2) jurisdiction by designating a substitute forum is founded upon the proposition that personal jurisdiction is waivable, it is not necessary to independently establish that suit could lie in the substitute forum absent the designation. I thus believe that the district court erred in imposing such a requirement in this case and that the majority, in turn, errs in endorsing what the district court did.

I believe the Seventh Circuit's opinion in *ISI International* is instructive. There, neither party had raised the issue of Rule 4(k)(2) before the district court. *ISI, Int'l*, 256 F.3d at 551. The Seventh Circuit stated:

> ISI International did not rely on Rule 4(k)(2), but S&A's appellate lawyer was ready for the ques-

tions asked during the oral argument. When the court inquired whether S&A would be subject to personal jurisdiction in any other state (California, for example), counsel was noncommittal. More discovery would be needed, counsel suggested. But S&A does not need discovery to learn *its own acts*. Nor is it apparent how more facts could contribute to resolution of the question. S&A had it within its power to knock out Rule 4(k)(2) by agreeing that it is subject to personal jurisdiction in some other state. It proved unwilling to do so. We therefore conclude that under Rule 4(k)(2) jurisdiction is proper in the United States District Court for the Northern District of Illinois.

*Id.* at 552. Thus, consent to jurisdiction by defendant's counsel would have been sufficient to defeat Rule 4(k)(2) jurisdiction.[2] The Seventh Circuit rejected the need for further factual inquiry as the consent of defendant's counsel was all that was required.

It appears that the majority arrives at its holding based upon the appearance of the words "could proceed" and "appropriate" in *ISI International*, *see* 256 F.3d at 552, and the words "could have brought suit" and "suitable" in *Touchcom*, *see* 574 F.3d at 1415. Reading the

---

[2]    The quoted passage also, I believe, contradicts the assertion of the district court in this case that consent must occur at the time the complaint is filed. In *ISI International*, the question of consent necessarily arose at a time after the complaint was filed as neither party raised the issue of Rule 4(k)(2) before the district court. Thus, the Seventh Circuit implicitly acknowledges that defendants could defeat Rule 4(k)(2) by consenting to jurisdiction elsewhere at some time after the complaint was filed.

relevant part of its opinion, *see* Maj. op. at 14-15, I understand the majority to be taking the position that these words support the requirement that, in this case, there be a showing that suit could have been brought in Illinois in the first place. I am unable to agree. I do not believe that these words, standing alone, are enough to support engrafting this added requirement onto the Rule 4(k)(2) procedure, especially where that procedure is founded upon the principle that personal jurisdiction is a matter that is waivable. In addition, I am unable to reconcile this added requirement with the Seventh Circuit's statement that the consent of defendant's counsel at oral argument would have been sufficient to "knock out Rule 4(k)(2)." *ISI, Int'l*, 256 F.3d at 552.

The majority also expresses the concern that allowing a party in Cipla's situation to designate another forum would allow the party to undo an adverse final judgment and obtain "the chance to litigate from a clean slate." Maj. op. at 15-16. The majority's desire to see litigation brought to a conclusion is understandable. However, this concern is present in every case where a default judgment is challenged for lack of personal jurisdiction. I do not believe this legitimate concern can trump the requirement that a court have personal jurisdiction over a defendant and the consequences that result when a judgment is entered against that defendant in the absence of such jurisdiction.

Moreover, allowing Cipla to designate an alternative forum would aid in bringing this litigation to a conclusion. If this case were transferred to the Northern District of Illinois, Cipla would have two options, either respond to the allegations and fully litigate the dispute or suffer the consequences of a default judgment. Importantly, Cipla would no longer be able to challenge a default judgment

for lack of personal jurisdiction, and Merial would have the opportunity to fully press its case.

## IV.

For the foregoing reasons, I believe that the district court erred in not allowing Cipla to designate the Northern District of Illinois as a substitute forum for suit against it. I therefore would reverse the decision of the court and would hold that the court lacked personal jurisdiction over Cipla under Rule 4(k)(2). Consequently, I (1) would vacate the contempt order and underlying default judgment against Cipla; (2) would vacate the injunction against Cipla, Velcera, and Fidopharm; and (3) would remand with the instruction that the court transfer the case to the Northern District of Illinois. Accordingly, I respectfully dissent.